Good afternoon, Your Honors. I'd like to begin by focusing your attention on the board. It was in our brief, but to understand the argument, it's useful to review just very briefly the chart that's in front of all of us. All right, very good. Keep in mind that the lumen's at the top. That's the storage area of the bladder. The luminal direction is toward the bladder. The purple is the discrete submucosal layer. In order to get down to the submucosal layer, you need to remove or delaminate the layers on either side. The big muscle layer you see on the luminal side, and then on the luminal side, it's our position that you need to remove or delaminate at least the epithelium and the lamin appropriate to get down to the submucosal layer. Now, this is jury trial, right? It was a jury trial. That's correct. Now, what's the problem? Is it claim construction or jury instruction? It's our view that it was claim construction, because our position, which was very much based on incorporation by reference, was rejected at the claim construction stage. The 508 patent. And our position is that the 389 patent expressly incorporates the procedure of preparation in the 508 patent. When you look at the 508 patent, there is a paragraph that begins that shows how the SIS, or small intestinal submucosal material, is prepared. There's perfect correspondence between the two. The claims in the 389 patent have in them a delamination of, quote, the luminal portion of the tunicum cosa. Those words are not found in the specification of the 389 patent. Can I just interrupt, just because I want to make sure I get in? I mean, I'm going to ask you about what you're saying, and I want to stop before you go too far. Firstly, on the charts, there's also a chart that you all submitted during litigation, and that's in the appendix 5909, right? That was part of defendant's initial opposition, and it was in our appendix labeled A5909. And there's at least what I think may be somewhat of a significant difference between this chart and that chart. And that is that in the chart, in 5909, you show a basement membrane, and then you have the epithelium cells separated out, and here, in this chart, you have the epithelium layer, and you define that as including the basement membrane. Correct. And so which, I mean, isn't this a little different, or is it epithelium? I don't think the chart that you're looking at was at the preliminary injunction stage. I admit I got smarter as we got to the marking stage. But our position has been, from the marking stage forward, that the basement membrane is part of the epithelium. Does the basement membrane contain any epithelial cells?  No, it does not, right? Epithelial cells are attached to the basement membrane. Otherwise, they would fold off in space. And I would direct your attention... But the epithelial basement membrane does not contain any epithelial cells. It does not contain epithelial cells. The cells are attached to the basement membrane. But I would very much direct your attention to Banks. If you look at A6417, it is a very important veterinary treatise. It was in 1993. It discusses the tunica mucosa. It discusses the epithelium. And in there, it makes the point, the basement membrane is a constant feature of the epithelium. So by the time we got to the marking stage, we were referring to it as the epithelium basement membrane. That was the trial testimony. That's why this chart was used at trial. But in the context of the marking, our position was always that you had to delaminate or remove the lamina propria. And if you're delaminating the lamina propria, you're taking out the basement membrane anyway. Because it's liminal to the submucosa. Well, let me ask you. And then going on to what you were talking about, which is the 508 patent being incorporated. There is something, though, in the 389 patent that seems to me... So tell me why I'm wrong. In column 2, lines 24 and 25, it cites... And now I'm in the 389. It cites the luminal portions of the tunica mucosa layers slash the epithelial layers. So why isn't that a definition that we ought to be able to take to the bank? Well, first of all, it is not precise. Notice that it's in the plural. Portions of the tunica mucosa layers, the epithelial layers. It's coming right in a sentence where you have expressly incorporated the 508 patent. It needs to be read harmoniously with the incorporated 508 patent. And when you read the 508 patent, what you have is a discussion of layer G. Layer G is a combination of the lamina epithelialis mucosa and its lamina propria. And so the way you harmonize that is you say, when this was written, it was directional, and they were thinking of layer G and the 508, which is the combination of the lamina propria and the epithelial layer, and they brought them together. And from the position of the submucosa, it is. You can regard that as epithelial layers. Now, a further point here. If you go on, it says the resulting submucosal tissue. It does not say the resulting submucosal tissue plus lamina propria tissue. And when you go on further, it talks about spindle cells, and it talks about blood cells. What is not mentioned, which would otherwise be mentioned, are muscle cells from the muscle layer, muscularis mucosa. What's that telling you? That everything on the other side of the submucosa is gone. And that gets right to the essence of this patent. It's entitled, Urinary Bladder Derived Tissue Graph. And the idea is to grow the graphs from the discrete submucosa layer, or the purple layer right in the chart. Now. Mr. Galbraith, if we agree with the positions you've expressed and are about to express, do we send it back to the jury, to the court on infringement, or do you win? We win. And I would direct you to page 56 of their brief, of Cook's brief. Easy to remember because it coincides with Federal Rule 56, the Summary Judgment Rule. And right there, they say accurately that if our claim construction is correct, then we prevail on literal infringement. And the reason is simple. And that is that our product contains epithelial basement membrane. It contains lamina propria. The claimed product in the 389 stops before you get the lamina propria or the epithelial basement membrane. Therefore, we cannot infringe. It's that simple. And they acknowledge it on page 56 of their brief. There is no reason to send it back. Their claim does not reach and cannot be interpreted to reach a composition that includes lamina propria or lamina propria and or basement membrane. It's that simple. Now, they go on and talk about, well, it should be set back under the Doctrine of Equivalence. We say no. Why do we say no? Look at the pretrial state. They did not reserve Doctrine of Equivalence as an issue for trial. It is forfeited. And Judge Sharpe was correct as we moved to a trial to keep the trial and the issues for trial confined to the pretrial statement. He was literally shot. Literally shot on that issue, yes. Do we know how much submucosa is in your Acell product? You know, this is not the subject of the briefing. It was very much debated between experts at the trial. If you look at the chart, you'll see there muscularis mucosa. That's a natural layer of separation. It's a muscle layer. It's a natural layer of separation. Their argument was that we didn't get out every last cell or every last piece of material from the submucosa layer. Our position was that we did. That got down to an examination of microscopic slides between what we thought was a wonderful expert on our side and an expert on their side who we think didn't examine the slides correctly. But that was a jury issue we lost. That's why you don't see it displayed in our brief. Nevertheless, the judge's instructions in terms of any submucosa were as long as you have and he misinformed the jury by saying it was a tissue type when it's a layer. And having said all that, as long as they thought there was any material from the submucosa layer, then we would have infringed even though both the 389 patent and the 508 patent are very much in terms of discrete tissue layers. And what you're trying to do is use the layer for purposes of regenerating tissue. And there was no doubt that we shredded the submucosa layer. But having said all that, if we're correct on our claim construction position, then we should prevail in this court. And it should not be set back under the doctrines of equivalence because their claims are very clear that you have to delaminate the lamina propria and the basement membrane, and therefore there's no way that we would meet that limitation. What's the correct claim construction? The correct claim construction, the luminal portion of the tunica mucosa equals layer G in the 508 patent, namely the lamina epithelialis mucosa and its lamina propria. That is the correct claim construction. That was our consistent position, and we could never get the trial judge to go for the incorporation by reference. Were you including in that statement the positive statement that there would be no effective submucosal material? It doesn't matter. As long as we have in our product, as we do, epithelium and basement membrane and lamina propria, we can't infringe their claims because their claims require that the lamina propria and the basement membrane be excluded. So that's why they say on page 56 we would be entitled to some of the judgment, and by that I mean I would take the judgment in this court based upon our claim construction position. And even if we were to conclude that that was the case, there was separation with respect to the basement membrane, would we have to reach the issue of the lamina propria? Wonderful question, and the answer is no, we would not. Because as long as we have a basement membrane in our product, which we showed at trial, then we cannot infringe. Now let me turn briefly to the separate appeal of Purdue Research Foundation, because I want to try and set forth for you what is and is not properly before you. I'm going to try and do that rather quickly. The pretrial order preserved for trial only the issue of whether there was any omitted embedder in the 265 patent. That was it. And so what Judge Sharp did was to say they, PRF, could not proceed on the basis of priority of invention. Therefore, they could not take the position that Dr. Balak was the sole embedder. They could not take the position that Dr. Spivak was not an embedder. It was established at the time of the pretrial statement that Dr. Spivak was an embedder, only issue were there additional embedders. In terms of the joint inventorship issue, Judge Sharp went through the evidence in great care and showed that there was no evidence that was going to rise to any level that suggested that Dr. Balak contributed in any significant way, or contributed really at all, to the Spivak basement membrane inventions. So that's the joint inventorship issue. Now, with respect to the other issues, constructive trust, we're getting down to the state law issues. That is not before you, as Judge Sharp said. It wasn't pled under any analog. Well, why not wait and see if they're raised on the argument? All right. These other issues. All right. Then I had the unjust enrichment theory. I'd just like to comment on that just very briefly there so you understand that with respect to that, they asserted inversion and replevant accounts against us. It was based upon wrongful assertions that we had stolen their materials. We went on a summary judgment. That's not before you. We know unjust enrichment that traces its way back to research at this point. Inventorship is not a state law issue. It's strictly a federal issue. And then the final issue that they have that they throw out relates to assignment. That's a straight contract issue, and it's Hornbook contract law, including Indiana, that when you have a contract issue, there can be no unjust enrichment. You either have express contract or you have quasi-contract or you have no contract. And so the assignment issue wasn't in the pre-trial order. It's not before you and isn't something that should be the subject of argument. I think you've grasped my argument with respect to the claim construction. There's a lot more I could say, but it's in the briefs, and I'll save the remaining amount of my time for tomorrow. Thank you, Mr. Galbraith. So you are Mr. Lueders? Yes, Your Honor. I, along with my partner Holly Bonta, represent Cook Biotech, and will be addressing the claim construction issues. My co-counsel represents Purdue Research Foundation and will be addressing inventorship-related issues. First of all, this chart is wrong. It's unsworn, and it didn't even appear until trial. This was not at the Markham hearing. Appendix A6413 was the chart they put under oath, under Dr. Balak's declaration for the judge at the Markham hearing. And unlike this one, as Judge Crose pointed out, it separated the basement membrane from the epithelial cells and recognized that the epithelium is different than the basement membrane. The infringing product is important. Wait, you say this didn't appear until trial? Yes. It was admitted at trial? It was admitted as a demonstrative evidence, frankly, as a housekeeping matter. I don't think it was ever sworn or attested to by any witness. Well, it was admitted, by the way. But it was admitted. Yes. Then why can't it be here? It's admitted in evidence, and they made it a part of the record. But the Markham ruling, and his claimed Markham interpretation is different than what they advocated before. But they advocated below. But if it was a proper exhibit below, it's proper up here, and so why throw cold water on it? You can differ with it. It's content. Yes. But it's acceptability to be before us. It's admitted, but it's wrong. What is right is what they swore to on the road at the Markham hearing and what the judge relied on at the Markham hearing. The claim construction that he proffered to you is different than the claim construction they advanced at trial. That's not an A423 in the judge's Markham ruling. It's in the briefs, is it not? Yes. And you contravened it in writing, and I gather that you're going to do so now before us as well. I think it will help our understanding to work with the definitions that we've been offered in argument. Very good. I would like to focus on independent claim. It's what I call the harmless error claim because all of their Markham arguments say they're wrong. Pivot on the word delaminated or pivot on the word at least a luminal portion of a urinary bladder. Those terms do not appear in independent claim 8. Independent claim 8 was found under partial summary judgment to be infringed but for the one question sent to the jury on the presence or absence of submucosa. And so most all of their claim construction arguments pivot on words that aren't even in claim 8. The only word they hang their hat on in claim 8 is the presence of the words urinary bladder submucosa. However, their arguments are, well, urinary bladder submucosa means all of the attributes that they've tried to ascribe to delaminated and all the attributes they've tried to ascribe to at least a luminal portion. That is flawed legal reasoning. That would render delaminated superfluous. That would render at least a luminal portion of the urinary bladder. What about the reference to the 508 patent? The 508 patent is an intestine patent. I know. And it is absurd to a person of ordinary skill in the art that the physiology of the lining of a bladder is informed by the physiology of the lining of the intestine. The intestine absorbs nutrients. It's got villi. It's got a totally different body function. The bladder, by contrast, is a barrier to keep toxic urine in. So it's like comparing cow's feet to chicken's feet. There may be some analogies, but a person of ordinary skill in the art would realize that you don't make a strict comparison. Moreover, the most important testimony, perhaps in the brief, they took issue with, and so we reprinted it on page 4 of our rare reply book, is Dr. Badlack admitting that the stratum compactum in the intestine is part of the lumina propria. And they don't dispute that in the 508 patent, the stratum compactum, which is a subset of the lumina propria, remains. So by definition, even the intestine patent, by their own testimony and acknowledgement, leaves part of the lumina propria behind in the finished commercial product. So their whole argument that, well, incorporate the 508 intestine patent and voila, the basement membrane and all of the lumina propria are gone, is simply wrong. So we're not going to assume that 508 governs. What is it you're relying on, on the 389 patent, to tell us what's included and what's delaminated? The portion, if you quote my claim, line 25, where it says the luminal portion, the epithelial layers, shows they can't be getting rid of all the lumina propria because those are the epithelial cells. Remember, these are extracellular matrices. So that's it? So the epithelial layers are delaminated and everything else. Yes. The basement membrane and the lumina propria, they all stay. Because they are made of collagen, which is good. The cells are bad. The cells are what gives you the antigenetic response. So it's an extracellular matrix. You get rid of the cells. You don't need to get rid of any more. If I made it, I'd receive the remainder of my time. Okay, we're ready. Mr. Keeley? Thank you, Your Honor. May it please the Court, William Keeley for Purdue Research Foundation. I am going to focus on the inventorship issues and the unjust enrichment issues. And I want to start with a question, which is, what happened here on the inventorship? And I want to go straight to the evidence. In fact, I want to go straight to words of Dr. Badlack in the record 81818. I quote, Investigators at Purdue University, the institution from which Acell Inc. licensed the UBS-ECM technology, and their colleagues have investigated the composition of the UBS-ECM in a systematic fashion. The UBS-ECM, a construct that Acell Inc. said in this document written in August 1999 over Dr. Badlack's signature under an SBIR application to the federal government, stated that UBS was something that Acell had licensed. In fact, that part of the statement was untrue, and that's undisputed. Acell never did get a license for the UBS construct. But they told us something else important in that same document on the very previous page, 81817. They told us in the section entitled Preparation of UBS, a very detailed discussion, again I quote, The transitional epithelium is removed by either mechanical abrasion or by use of one molar saline, which effectively lifts the transitional epithelium off of the underlying basement membrane, leaving the basement membrane intact. End of quote. That statement is taken from a section of the same document entitled Preparation of UBS, UBS was the construct that Acell wanted to license from Purdue, and never did. Universities are uniquely vulnerable. They invite the world to come to them. Their doors are open. Their research is accessible in many ways. And sometimes that works well. Companies like Acell sometimes license technology from universities. But we have to ask the question today, what happens if the company doesn't get a license and tries to do an end run by harvesting the researcher instead? Plucking the researcher from the institution, and suddenly the researcher's invention, that UBS ECM that they wanted to license with a intact basement membrane appears a few months later, from August 1999 to December 1999, in a patent application that leads to the 265 patent. Mr. Keeley, you've been telling us of the problems of universities, but isn't there a technical issue here on the basis of which the trial court ruled a failure to properly plead? Actually, no, not at all. But wasn't that the ground on which the trial court ruled? No, actually, the court noted that the contention that Dr. Badalak would be the sole inventor was not before the court. And I couldn't agree more. We never pled that Dr. Badalak was the sole inventor. We pled that Dr. Badalak was an omitted inventor. The party who pled sole inventorship was the appellants, who pled that Dr. Spivak was a sole inventor. That was the only such allegation. Dr. Badalak is an omitted inventor. Whether there are other inventors depends, candidly, depended at the time on whether Dr. Spivak could come forward with evidence with respect to some of the dependent claims that he had participated in some fashion in those dependent claims during that short period of time in the late 1990s that led up to this licensing effort. He never did that. And so perhaps by default, Dr. Badalak will end up being the sole inventor, but that's not a pleading problem. We can see the real problem readily by lining up three documents. In 1994, in a dated witness invention disclosure, Dr. Badalak described and disclosed his basement membrane invention. The authenticity, credibility, accuracy of this document has never been challenged by anyone. Was there any evidence that Dr. Boylec shared that information with Dr. Spivak? Yes. Among the evidence is the SBIR document itself, which prior to the 1999 provisional patent application, it has both Dr. Badalak's name on the first page, Dr. Spivak's name as a header on the internal pages, and talks about this invention, the basement membrane invention, as something that Acell had been working with. It says that they've practiced the invention, they've made some of the embodiments, and they're looking to advance the manufacturing of the embodiments. Dr. Spivak unquestionably had access to that invention according to this sworn document on their oath. What's the date of that document? August 1999. Of the three documents, the 1994 invention disclosure, the August 1999 SBIR document, and the December 1999 provisional patent application that led to the issuance of the 265 patent, two of the three credit Dr. Badalak, credit Purdue with the invention. The 1994 document, the August 1999 document. The only document that does not credit Dr. Badalak is the patent application itself. And yet we know that Dr. Badalak was there. It's an undisputed fact that he participated in the preparation of the provisional application that led to the issuance of this patent. We know that he's a prolific inventor. We know that he made this invention. The 1994 document says so, the 1999 document says so. We also know, according to Dr. Spivak's own admission, that the only reason, the only reason, and this is in their briefing, in our briefing as well, that he initiated the filing of the December 1999 application was that he didn't get the license from Purdue. The PEP law has to be able to solve this problem. In the American Siaman case, the University of Colorado versus American Siaman represented an important step in this court's jurisprudence to solve this kind of problem with a specific posture of universities and the specific vulnerability that they have to being taken advantage of. In Colorado versus Siaman, it clearly said, take 256, take state law unjust enrichment remedies, put them together, and the PEP law can solve this problem with a supplement from the state law. I'll reserve my remaining minute for rebuttal if I may. So you saved a minute for rebuttal if there is a need for rebuttal, is that right? I would like to speak to the unjust enrichment claim if you... No, I think you've exhausted your time. We'll leave that for the briefs. Thank you, Your Honor. Okay. Mr. Galbraith? Yes, Your Honor, I have just a few very quick points that I would like to make. First of all, I really didn't pick up on your claim with the question in mind initially. Let me just quickly address it. In Claim A, it talks about submucosal... submucosa and the amount affected. That issue wasn't put before the jury. It was any amount. So the judge just read the limitations of Claim A out. But beyond that, when you look at the 389... Well, what was before the jury? The jury were instructed that if there were any submucosa at all present, that's the first. That's correct, whereas Claim A says, in the amount affected to induce endogenous connective tissue growth. So there was a complete disconnect between what the claim says and what was put before the jury. But there's one further point, and here this is a very good point. In the 389 patent, it talks about abrasion from the luminal side, right in the area where you were focusing on, how we abrade from the luminal side. It was undisputed. It's in Dr. Battelak's testimony, it's cited in our papers, that one swipe from the luminal side eliminates the basement membrane. So there is no way there is any basement membrane in what is in the 389 patent. It just can't be. Now, with respect to how a person of ordinary skill would construe these, this is how PRL, in the interference proceeding, would have adopted the speed patent application, construted it. All these compositions consist essentially of the same tissue layers and are prepared by the same method, the difference being that the starting material is small intestine on one hand and urinary bladder on the other. That's the way it would be construed by any person looking at these two patents together. That's quoted on page 12 of our brief. It comes out of the speed act patent, but it was adopted by PRF in the interference proceeding. Finally, with respect to PRF's argument and the SBIR claim, a couple of things. First, in their argument or in their brief, where they bring it in is in that section that deals with priority of invention. It's outward. Further, when you look at it, you're going to see that with respect to the materials that talk about the graph compositions, it's all in the context of Dr. Spivak, not Dr. Battles, being the program director and I think even in places the principal investigator, but any of that, and it's a mishmash of materials when you look at it. But I don't see how that has much relevance to what happened back in 1994. And then going back to 1994 for just one second, please read that 1994 disclosure. Please read what we have to say about it, because when you read it, it's very clear that what is happening is that they're following the procedure of the Bible weight patent and they are eliminating the epithelial basement membrane, which they describe, by the way, as epithelial basement membrane right in that document, and they are eliminating the lamina propria. And we have the testimony of one of the UBS inventors, Matt Leninger. He was the guy who got tasked with making UBS and he was very clear that he was removing the muscle cells on either side of the subleukosis at the time of the 1994 disclosure. In other words, we're right down to the 389 patent exactly the way we interpreted it. Thank you very much. Thank you, Mr. Galbraith. Now, I think on the cross-appeal, we didn't get to it, so I think it's fine. We'll rely on the briefs for those. Is there something you need to tell us, Mr. Nunes? Well, we reserve this for Healy to speak, but the focus seems to be more on claim interpretation, so whichever of the other speakers... I think you can rely on your briefs on the cross-appeal. It wasn't explored here. It wasn't responded to. Claim interpretation? Claim interpretation wasn't the cross-appeal, so you don't have an opportunity. I will take my remaining minute. This is only on the cross-appeal? Yes. Okay, you have one minute. This is a cross-appeal, Your Honor, from summary judgment on the inventorship issue. But not on any new issues, just those on your rebuttal of the cross-appeal. That's correct, on the inventorship issue, which was the subject of a summary judgment against Privy Research Foundation. It is unquestionably error for these facts to be summarily adjudicated against Privy Research Foundation on the record, including the documents that I highlighted in the moment of coming to court. The 94 disclosure is sufficient to establish that Dr. Badlock, in fact, fully possessed the invention in 1994. The August 1999 SBR clearly reaffirms that and amounts to an admission by ASA. There's plenty of evidence to find clear and convincing evidence that Dr. Badlock is an omitted inventor. What cannot hold is to ignore all of that evidence and summarily adjudicate that Dr. Badlock is not an inventor. The trial judge did that solely on the basis of Dr. Badlock's disavowal. No precedent of this court elevates such a disavowal over the research record. The research record has primacy under abundant precedence of this court. I will note as just one example the Penu decision by Judge Lorry, finding that... It was a decision of the court. Thank you, Your Honor. That it was improper for the trial judge to summarily adjudicate such... You have to leave these issues for the briefs. They're very complex. Argument time is very short. As you know, we shall do our best with the case. Thank you very much. Thank you all. It was well presented.